**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHRISTOPHER F.,[1]

       Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

Case No. 3:22-cv-114

Bowman, M.J.

**MEMORANDUM OPINION AND ORDER**[2]

Plaintiff Christopher F. filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents a single claim of error for this Court's review. As explained below, the ALJ's non-disability decision is supported by substantial evidence in the record as a whole and therefore is AFFIRMED.

**I. Summary of Administrative Record**

On March 20, 2017[3], Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for supplemental security income ("SSI"), alleging disability beginning on August 1, 2016 based primarily on chronic bronchial asthma. (*See* Tr. 340, 275-289). After his application was denied initially and on reconsideration, Plaintiff requested an evidentiary hearing. On June 10, 2019, Plaintiff appeared with counsel and testified

---

[1] Due to significant privacy concerns in social security cases, this Court refers to claimants only by their first names and last initials. *See* General Order 22-01.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge. *See* 28 U.S.C. §636(c).
[3] Plaintiff filed his application before the date that revised regulations went into effect. *See generally*, 20 C.F.R. § 404.1520c. Therefore, his case falls under prior SSA guidelines. (Tr. 144).

1

before Administrative Law Judge ("ALJ") Stuart Adkins. A vocational expert also testified. (Tr. 62-89). On September 17, 2019, the ALJ issued an adverse decision. (Tr. 134-153). Plaintiff filed an administrative appeal and, based upon several errors, the Appeals Council remanded to the ALJ for reconsideration. (Tr. 154-160).

On January 11, 2021, ALJ Adkins conducted a new evidentiary hearing via telephone, at which Plaintiff appeared with new counsel and provided additional testimony. (Tr. 37-61). A new vocational expert also testified. On March 1, 2021, the ALJ issued a second adverse decision. (Tr.15-29). The Appeals Council denied Plaintiff's request for further administrative review, leaving the ALJ's second decision as the final decision of the Commissioner.

In that March 2021 decision, the ALJ determined that Plaintiff was insured for purposes of DIB only through June 30, 2018. (Tr. 18). He has the equivalent of a high school education and "some college" and was 41 on his alleged disability onset date, defined as a younger individual age 18-44. (Tr. 27, 70). He changed age categories to a younger individual age 45-49 by the time of the ALJ's second decision. (Tr. 27). Prior to his alleged disability, Plaintiff worked as a pinsetter installer, a house repairer and as a countertop installer – all of which were performed at the "very heavy" level, requiring Plaintiff to lift up to 200 pounds. (Tr. 26, 71, 74). Plaintiff also worked briefly as a real estate agent at the "light" exertional level.

The ALJ found that Plaintiff has the following severe physical impairments: "thoracic and lumbar degenerative disc disease, degenerative joint disease of the left shoulder, asthma, obstructive sleep apnea, obesity." (Tr. 19). The ALJ also noted anxiety but found that condition not to be a medically determinable impairment. (*Id*.) None of Plaintiff's impairments, either alone or in combination, met or medically equaled any

2

Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that he would be entitled to a presumption of disability. (*Id.*) Considering all impairments, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform sedentary work, subject to the following additional non-exertional limitations:

> No more than frequent pushing and/or pulling or overhead reaching with the left upper extremity. No more than occasional crawling or climbing of ramps and stairs. No climbing of ladders, ropes, and scaffolds. The claimant can tolerate occasional exposure to dust, odors, fumes, and pulmonary irritants.

(Tr. 20). Based upon Plaintiff's age, education, and RFC, as well as testimony from the vocational expert, the ALJ determined that even though Plaintiff could no longer perform his past work, he still could perform jobs that exist in significant numbers in the national economy, including the representative occupations of film touch-up inspector, gauger, and printed circuit board touch-up screener. (Tr. 28). Therefore, the ALJ concluded that Plaintiff was not disabled. (*Id.*)

In this judicial appeal, Plaintiff argues that the ALJ erred when he found Plaintiff capable of "frequent" overhead reaching with his left upper extremity, rather than accepting the "occasional" overhead reaching limitation found by the state reviewing physicians.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

3

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted). *See also Biestek v. Berryhill*, 139 S. Ct.1148, 1154 (2019) (holding that substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion and that the threshold "is not high").

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity ("SGA"); at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that

4

claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520(g), 404.1560(c), 416.920(g) and 416.960(c).

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §§ 404.1512(a); 416.912(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. *See* 42 U.S.C. § 423(d)(1)(A).

**B.   Plaintiff's Single Claim of Error Regarding his Shoulder Impairment**

**1. Relevant Medical Records**

Plaintiff's medical records reflect that he sought treatment for a shoulder injury over a discrete period of months in 2017. He reported that he fell on his outstretched arm and injured his shoulder in February 2017, (Tr. 512; *see also* Tr. 425, 447), but that the injury initially improved somewhat on its own. (Tr. 512).[4] Therefore, he did not seek any medical care for the injury until April 2017. (Tr. 425). After an x-ray confirmed a lack of fracture or dislocation, his primary care physician, Dr. Snider, recommended physical therapy ("PT"). (Tr. 426). At the time, Dr. Snider completed a form for the Ohio Department of Job and Family Services in which he opined that Plaintiff's shoulder pain was expected to last for eight weeks. (Tr. 695). However, when Plaintiff's shoulder pain did not fully resolve, Dr.

---

[4] The undersigned's review was made more difficult by the Commissioner's citation to PageID numbers without the inclusion of citations to the administrative transcript. Unfortunately, PageID numbers are of limited use in the review of social security records. For that reason, Local Rule 8.1.A(d) <u>requires</u> parties to cite to the administrative record "regardless of whether a party also chooses to provide PageID citations."

Snider ordered an MRI. A June 2017 MRI revealed a tear in Plaintiff's supraspinatus tendon, infraspinatus tendinosis and a subacromial enthesophyte. (Tr. 143; *see also* Tr. 93). Plaintiff underwent a recommended arthroscopic surgery to repair the tear on July 26, 2017. (*Id*.)

Plaintiff began post-surgical physical therapy on July 28, 2017. (Tr. 447, 464-65, Tr. 661). Plaintiff was prescribed PT twice per week, but attended slightly less frequently. By his fifth PT visit on August 23, 2017, Plaintiff reported "doing great" with his pain at "zero for the last several days" despite some continuing functional tightness and weakness. (Tr. 670). Plaintiff's sixth and final PT appointment was August 28, 2017. At that time he reported being pleased with his progress and was experiencing only intermittent and minimal pain, described as no more than a 1 or 2 out of a 10-point scale. (Tr. 672). He was able to do light housekeeping, meal prep, laundry and dishes as well as light outdoor chores, despite some continued weakness that he reported limited him from "*heavier* overhead lifting" and "*full* functional reach behind his back." (*Id*., emphasis added). Plaintiff was discharged from PT with instructions to transition to a community based fitness center to continue rehabilitation on his own. (Tr. 674). The treating therapist completed a form that expressly noted that Plaintiff had met *all* therapeutic short term and long-term goals, including achieving "full" range of motion. (*Id*.)

Plaintiff never returned to PT or to any other provider concerning his shoulder injury. He also did not again mention any issues concerning his left shoulder in any of his routine appointments through September 2020. (Tr. 477, 480-81, 483-484, 486, 753, 756, 759, 821, 841, 844, 845, 848, 872, 875, 878). And, despite the fact that several treating sources provided medical statements in 2018 and 2019, none mentioned Plaintiff's shoulder as a source of concern beyond the single April 2017 statement in which his

6

treating physician opined that Plaintiff's shoulder pain could be expected to last 8 weeks. (*Compare* Tr. 694-95 (April 2017 report) with Tr. 507-11, 696-699, 714, 797-802). In January 2019, Plaintiff established care with a new primary care physician and reported only thigh pain. (Tr. 727). A musculoskeletal examination at that time was grossly normal. (Tr. 728). In February 2019, Plaintiff attended a consultation with a sports medicine physician, Corey Ellis, M.D. regarding his right thigh pain and numbness. (Tr. 739-740). Again he failed to mention any problem with his left shoulder and an examination revealed no clinical deficits. (*Id*.)

### 2. The Agency Physicians' Opinions

Two non-examining agency physicians reviewed Plaintiff's records at the initial and reconsideration levels. Dr. McKee first reviewed Plaintiff's records just two weeks after Plaintiff's shoulder surgery. At that time, Dr. McKee assessed Plaintiff's statements as "[f]ully [c]onsistent" with medical records. (Tr. 94, 143). He opined that Plaintiff could perform exertional activities consistent with light work and limited Plaintiff to "occasional push and/or pull" and overhead reaching with the left upper extremity based upon his diagnosis of a supraspinatus tear and tendinosis. (Tr. 95). On reconsideration, Dr. Prosperi, found Plaintiff's statements to be only "[p]artially [c]onsistent." (Tr. 126). However, Dr. Prosperi otherwise concurred with Dr. McKee's RFC opinions including the limitation to "occasional" use of his left upper extremity. (Tr. 117-120)

### 3. The ALJ's Analysis

In both written opinions, the ALJ gave the two consulting opinions only "partial" weight. The ALJ determined that Plaintiff could engage in "frequent" rather than merely "occasional" activities with his left upper extremity. (Tr. 145, 23). In his first opinion in September 2019, the ALJ explained that he was rejecting any greater limitation "[b]ased

7

on a thorough review of the medical record and the undersigned's personal observations of the claimant and his testimony during the hearing." (Tr. 145). The Appeals Council found this explanation to be overly brief, because it did not "provide adequate rationale for finding fewer left upper extremity limitations" and failed to fully evaluate Plaintiff's subjective complaints. (Tr. 156-157). Notably, the Appeals Council also remanded based on unrelated errors: a complete failure to discuss the opinion of a treating physician, and a discrepancy between the representative jobs found by the ALJ and Plaintiff's need to avoid concentrated exposure to fumes and pulmonary irritants. (Tr. 156-157).

After remand, in his subsequent May 2021 opinion, the ALJ addressed the previously overlooked opinion of the treating physician, and determined a new RFC that restricted Plaintiff to the sedentary level of work rather than the light exertional level that had been endorsed by the two agency physicians. The ALJ also significantly expanded his analysis of Plaintiff's left shoulder limitations and his reasoning for giving only "partial weight" to the consultants' opinion that Plaintiff should be limited to "occasional" use.

> Dr. Prosperi's reconsideration opinion was rendered in early December 2017, less than six months after the claimant's shoulder surgery (see Exhibit 2F at 12) and subsequent treatment, during a period of time when he was likely still experiencing the residual effects of the operation due to his degenerative joint disease. As noted in the prior decision, the claimant was discharged from postoperative physical therapy in August 2017 "after meeting most of the established rehabilit[ative] goals" (Exhibit 9A at 10 citing Exhibit 14F at 68). As noted above, the claimant testified that he had treatment for 2½ months following his surgery, and his shoulder subsequently returned to normal functioning. Given the claimant's testified-to return to essentially normal functioning, and the apparent lack of subsequent required treatment in the record, the undersigned finds that Dr. McKee's and Dr. Prosperi's more restrictive manipulative and reaching limitations are unnecessary. While it is possible that the claimant does not require any limitations on reaching and manipulation with the left upper extremity at this point, out of an abundance of caution, the undersigned has imposed the noted "no more than frequent" level of limitation.

8

(Tr. 23-24; *see also* Tr. 25, rejecting pushing/pulling limitations offered by two nurse practitioners who were not acceptable medical sources "[g]iven the claimant's discharge from physical therapy due to meeting rehabilitation goals and his testimony that his shoulder has essentially returned to normal.").

Plaintiff argues that the ALJ's expanded analysis remains insufficient and that the ALJ substituted "his interpretation of the medical evidence for that of the state agency physicians." (Doc. 9 at 5, PageID 887). The Court finds no reversible error.

Plaintiff first points to testimony at his first hearing in June 2019 to support a greater level of limitation. However, consistent with his application for benefits, Plaintiff's testimony at his first hearing focused on his breathing difficulties. (Tr. 76-83). In fact, close examination of the referenced testimony confirms that Plaintiff made no mention at all of his shoulder injury, or of his surgery, or any left arm limitations. The sole reference to *any* upper extremity limitation occurred in response to the ALJ's series of questions about Plaintiff's alleged limitations (based on breathing issues) in his ability to perform household chores, to stand, and to lift or carry things. (Tr. 79-81). In response to a specific inquiry about how much weight he could lift, Plaintiff testified that his ability is reduced as compared with his prior ability because "I've gone through some pretty serious atrophy over this period of time" (referring to his alleged disability onset) and have not "lifted much more than a laundry basket in a long time." (Tr. 81). Plaintiff linked his alleged lifting limitation to "atrophy" or disuse, rather than any type of arm or shoulder impairment, and made no mention of limitations on his abilities to push, pull, reach or lift overhead.[5]

---

[5]The undersigned assumes that Plaintiff was using the term "atrophy" loosely. The medical record does not reflect any formal diagnosis of or measurements relating to muscular atrophy.

In addition to Plaintiff's complete omission of any shoulder impairment at his first hearing, Plaintiff's testimony about his shoulder impairment in January 2021 underscores the lack of evidence of *any* possible impairment beyond August 2017. While Plaintiff's second hearing also focused on his breathing issues, counsel briefly raised the issue of whether Plaintiff's shoulder injury contributed to his alleged disability, arguing that "there is a period of time requiring analysis where his shoulder was in significant pain and did cause functional limitations." (Tr. 42-43). But counsel's questions were few in number, and Plaintiff's responses do not support disability:

> Q: …I know you've had corrective surgery on your left shoulder, which I believe is your non-dominant shoulder. And I know things are better now. But if you could, explain for the Judge the limitations that you had prior to that correction and also how long did it take you after your surgery *before things started working normally again*?
>
> A. Oh. Well, it was maybe 2 ½ months' worth of weekly physical therapy. I think it was 2 ½ months.
>
> Q: Okay. *And my understanding is, that's resolved now, though. Right*?
>
> A: *Correct. Yes.*

(Tr. 51-52, emphasis added). In short, Plaintiff unequivocally testified that his injury had fully resolved, meaning that he requires no limitations at all. When counsel inquired as to "how long" it took for his shoulder to "start[] working normally again," Plaintiff stated that resolution occurred following the completion of physical therapy. Although Plaintiff estimated that his PT course lasted "maybe 2 ½ months," medical records confirm that Plaintiff was released on August 28, 2017 after six post-operative PT sessions over the course of a month.

In this judicial appeal, Plaintiff briefly suggests that the ALJ should have considered a closed period of disability based upon his shoulder impairment, though he does not

10

identify either a start date or an ending date for this Court to consider. The Court notes that Plaintiff alleges disability beginning on August 1, 2016 and that the final ALJ decision was dated March 1, 2021. In order to demonstrate a closed period, Plaintiff was required to prove that he was unable to engage in "any substantial gainful activity" due to an impairment or impairments "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The undisputed medical records reflect that the acute phase of Plaintiff's shoulder impairment lasted for less than seven months. Plaintiff reported that he sustained a shoulder injury in early February 2017, for which he sought no medical care until April 2017. After conservative treatment failed, he underwent surgery in July 2017 to repair his torn tendon. He participated in six sessions of PT after surgery, and was released from follow-up care on August 28, 2017. At that time, Plaintiff had met all therapeutic goals and had full range of motion. Plaintiff himself testified that things had "returned to normal" after his course of post-surgical physical therapy.

To evaluate whether Plaintiff had a closed period of disability, the ALJ was not required to use any "magic words." The ALJ clearly discussed and fully addressed the relatively brief period during which Plaintiff exhibited limitations from his shoulder injury and limited Plaintiff to no more than "frequent" use of his left arm and shoulder notwithstanding the lack of evidence of any impairment after August 28, 2017. The ALJ acknowledged that Plaintiff had "some level of limitation during the period in question." (Tr. 24) However, the ALJ emphasized that by his own testimony, Plaintiff's shoulder impairment had completely resolved. And the ALJ further determined that Plaintiff's

11

"statements concerning the intensity, persistence, and limiting effects of these symptoms are inconsistent with a finding of disability." (Tr. 25).[6]

The record substantially supports the ALJ's reasoning that more restrictive shoulder limitations were "unnecessary" and that it was "possible" that no permanent RFC limitations whatsoever were needed throughout the disability period. Given that Plaintiff's shoulder impairment lasted for less than seven months and was fully resolved per Plaintiff's own testimony, the Court finds the ALJ's RFC determination out of "an abundance of caution" to no more than "frequent" use of his upper left extremity to be generous, but substantially supported by the record as a whole.

In Plaintiff's reply memorandum, he leans into his premise that "there is a battle between the ALJ and the state agency physicians, and the ALJ substituted his medical opinion for that of the actual experts." (Doc. 13 at 2). The Court disagrees. The ALJ's evaluation of the non-examining consultants' medical RFC opinion is quite different than "playing doctor." *See Wilkerson v. Comm'r of Social Sec.*, Case No. 1:12–cv–868, 2013 WL 6387810, at *8 (S.D.Ohio,2013) (holding that an ALJ may overstep her role if she reads an x-ray report and arrives at a conclusion not otherwise supported by a medical doctor, but does not overstep when she merely points out inconsistencies between the objective evidence, clinical records and a physician's disability-related opinions). Here, the ALJ stayed safely in his lane by merely evaluating the agency physicians' RFC opinions, without making independent medical judgments. An ALJ alone is legally responsible for determining what limitations to include in an individual's residual functional capacity. *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("[A]n

---

[6]Plaintiff does not challenge the ALJ's adverse credibility/consistency determination, which is generally given great deference. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."); 20 C.F.R. § 404.1546(c).

If the hypothetical RFC formulated by the ALJ is supported by the record, a vocational expert's testimony that an individual can engage in a substantial number of jobs will constitute substantial evidence to support the non-disability determination. *Varley v. Sec'y of HHS*, 820 F.2d 777 (6th Cir. 1987). An ALJ is not required to include restrictions in the RFC that the ALJ did not accept. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Additionally, an ALJ is not required to base each RFC limitation on a specific medical opinion, so long as the RFC is supported by the record as a whole. *See Coldiron v. Comm'r*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) (ALJ's determination that plaintiff could perform sedentary work, which rejected treating and examining physicians' opinions that he could not, did not overstep ALJ's role and was substantially supported); *accord Clemow v. Comm'r*, Case No. 1:16-cv-994, 2018 WL 1083494 at *8 (S.D. Ohio Feb. 28, 2018) (discussing cases and holding that "[t]here is no legal requirement that each limitation in an RFC determined by a ALJ correspond to a specific medical opinion."). Last but not least, a court may not reverse so long as the ALJ's analysis falls within a "zone of choice," a standard that is easily met here.

### III. Conclusion and Order

For the reasons explained herein, **IT IS ORDERED THAT** the Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

                                                   /s/Stephanie K. Bowman
                                                   Stephanie K. Bowman
                                                   United States Magistrate Judge